STATE OF MAINE                          SUPERIOR COURT
KENNEBEC, SS.                           CIVIL ACTION
                                        DOCKET NO. AP-19-11


LAWRENCE GERVAIS,
        Petitioner,

        v.                              **DECISION AND ORDER**
                                        (M.R.CIV.P. 80C)

MAINE PUBLIC EMPLOYEES
RETIREMENT SYSTEM,
        Respondent

## INTRODUCTION

This matter is before the court on the appeal by Petitioner Lawrence Gervais (Gervais) from a Decision and Order of the Board of Trustees of the Maine Public Employees Retirement System (MPERS) adopting the Recommended Final Decision of the Hearing Officer that found that Gervais had failed to meet his burden of proving his entitlement to disability retirement benefits pursuant to 5 M.R.S. §§ 17921 et seq. This petition for judicial review has been brought in accordance with 5 M.R.S. §§ 9061 and 11001 (Maine Administrative Procedure Act) and M.R.Civ.P. 80C.

For the reasons explained below, and after a careful review of the entire administrative record, the court concludes that it must deny the petition for judicial review and affirm the Decision and Order of the MPERS Board of Trustees.

## FACTUAL AND PROCEDURAL BACKGROUND

This case has a lengthy and complicated history. That history is thoroughly detailed in the two Final Recommended Decisions issued by the Hearing Officer dated March 16, 2017 and December 21, 2018. (*See Appeal*

1

*Packet, hereinafter "A.P." at 65.30 and 70.3)*. The court will not attempt to duplicate the Hearing Officer's efforts, but will summarize the critical points of the history of this case.

Mr. Gervais was employed as a middle school teacher at the Molly Ockett Middle School in Fryeburg for 28 years. In 2014 he was 56 years of age. The record supports the conclusion that he enjoyed teaching and was good at it. The Hearing Officer found that beginning in 2014, Gervais began to experience symptoms of depression and anxiety. A number of factors may have contributed to this, including the deaths of some family members and friends (including his mother and father-in-law), as well as a significant shift in curriculum styles in his school. Also, in 2014, Mr. Gervais appears to have had some conflicts with his middle school principal. These included allegations that he had made derogatory and offensive comments about her (which he denied), and that he tended to be sarcastic and negative. As a result, he was issued a reprimand and placed on an action plan for the 2014-2015 school year. This appears to have taken place in the middle of April 2014.

It was during this time period that Mr. Gervais began to think about leaving his teaching position. He was told by his wife that he had been calling out in his dreams for his long-deceased father. Around this time, he began to experience symptoms of diarrhea, shaking and a feeling of coldness. Accordingly, he sought medical advice and treatment from his long-time primary care physician, Dr. Stephen Barter, M.D., who instructed him to take the rest of the school year off due to the stress he was under. Dr. Barter wrote a note dated May 9, 2014 to the school principal (which Mr. Gervais dropped off on May 14, 2014) excusing Gervais from work due to depression and anxiety. Gervais remained out of work for the next academic year (2014-2015) as he received treatment for his mental health issues and also provided

2

support to his wife who had been diagnosed with cancer and who was undergoing treatment for that.

Mr. Gervais began seeing Dr. Robert Garber, Ph.D. for weekly sessions. He was offered a teaching contract for the 2015-2016 school year, which he signed. As the start of the 2015 school year approached, however, his symptoms of anxiety and depression increased and, after consultation with Dr. Garber, Mr. Gervais decided that he could not return to his position as a teacher, but would file an application for disability retirement benefits.

Mr. Gervais did, in fact, file an application for disability retirements benefits in August, 2015. In that application he identified the following condition as forming the basis of his claimed disability: "Depression Anxiety Syndrome" with symptoms including diarrhea, restlessness, heart palpitations, paranoia, nervousness, loss of confidence and worthlessness. (A.P. at 4). The application was denied on October 27, 2015. (A.P. at 148). Thereafter, on November 10, 2015, Mr. Gervais, through counsel, filed a timely appeal. Hearing Officer Richard Regan, Esq. was assigned to the case. *See* 5 M.R.S. § 17106-A.

In February 2016, counsel for Mr. Gervais notified MPERS that he would be filing an addendum to the application to introduce the issue of "panic disorder/agoraphobia" as a new condition/diagnosis. This followed the iudependent examination of Mr. Gervais by Dr. Carlyle Voss, M.D. in Jannary, 2016. The application for disability benefits was denied by the Deputy Executive Director on April 28, 2016, on the basis that the medical records submitted by Mr. Gervais did not support the diagnosis of panic disorder. By agreement of the parties, Mr. Gervais' last date in service was determined to be, and was changed to, September 21, 2015.

3

A full testimonial hearing was held by the Hearing Officer on September 21, 2016, at which he received the testimony of Dr. Voss, Jotham Oliver (a teaching colleague of Mr. Gervais), Karen Gervais (the Petitioner's wife) and Mr. Gervais himself. All of the witnesses were called by Mr. Gervais. In accordance with the procedure used by MPERS, the Deputy Executive Director reviewed the entire record, including the transcript of the testimonial hearing and the advisory opinions of the Medical Board (5 M.R.S. § 17106). On December 9, 2016, the Deputy Executive Director again denied benefits to Mr. Gervais. The Hearing Officer promptly scheduled the date for the filing of briefs.

On March 16, 2017, the Hearing Officer issued his "Recommended Final Decision For Remand After Opportunity For Comments." In that comprehensive decision, the Hearing Officer painstakingly discussed and analyzed the positions of the parties, the medical evidence submitted by Mr. Gervais and the advisory opinions offered through memoranda from the Medical Board. The Hearing Officer articulated the legal standard to be utilized in evaluating a disability retirement application pursuant to 5 M.R.S. § 17921(1), which provides:

> "Disabled" means that the member is mentally or physically incapacitated under the following conditions:
> A. The incapacity is expected to be permanent;
> B. That it is impossible to perform the duties of the member's employment position.

Moreover, the Hearing Officer acknowledged that Mr. Gervais had the burden of proving, by a preponderance of the evidence, "that the functional limitations" arising from his mental or physical conditions, "makes it

4

impossible for him to perform the essential duties of his employment position on September 21, 2015, his last date in service." (A.P. at 65.48).

In addressing whether Mr. Gervais had met his burden of proof with respect to the diagnosis of "Depression Anxiety Syndrome/Major Depressive Disorder with Anxious Distress," it is clear to the court that the Hearing Officer carefully examined and weighed the entirety of the evidence. Ultimately, he concluded:

> After review of the entire record, I find that the Appellant has proven by a preponderance of the evidence that the functional limitation of significant difficulty interacting with others arises from the condition of depression anxiety syndrome/major depressive disorder with anxious distress and makes it impossible for him to perform the essential duties of his employment position as of September 21, 2015, his last date in service. (A.R. at 65.50)

With respect to the diagnosis of "Panic Disorder/Agoraphobia," the Hearing officer found that there was "disagreement" between the medical providers on behalf of Mr. Gervais (Dr. Voss and Dr. Garber) and the Medical Board. (A.R. at 65.50). In particular, the Hearing Officer observed that Drs. Voss and Garber were of the view that the Medical Board was "wrong" in its opinion that Mr. Gervais' symptoms did not satisfy the diagnostic criteria of DSM-V. On the other hand, the Medical Board offered the view that Mr. Gervais' "fear" was limited to seeing people from work, not a fear of places from which there would be no escape. Moreover, the Medical Board did not find support in the record that Mr. Gervais had suffered multiple panic attacks, which is required under DSM-V. In short, the medical experts differed on the interpretation and application of the diagnostic criteria of DSM-V as it pertained to Mr. Gervais. The Hearing Officer concluded:

5

Given that this disagreement turns upon the application and interpretation of DSM criteria for these conditions, it is surprising that neither party offered into the record a complete account of the DSM criteria on which their respective positions were based. Thus, the parties are asking me to make a decision on this issue based upon the credibility of the purveyors of the evidence. Medical personnel on each side of the issue assert that the other side is either plain wrong or that their application of the facts to the standards is inadequate. Unfortunately, the diagnostic standards are simply not fleshed out sufficiently in the record for me to determine whether the Appellant's symptoms meet the diagnostic criteria for panic disorder or agoraphobia.

As a result, I find that the Appellant has not met his burden regarding the clinical existence of the conditions of panic disorder and/or agoraphobia as of his last date in service.
(A.P. at 65.50 – 65.51).

As a result of his finding, the Hearing Officer reversed the decision of the Deputy Executive Director as to the condition of "Depression Anxiety Syndrome/Major Depressive Disorder with Anxious Distress," and remanded the matter back to the Deputy Executive Director for consideration of whether that condition was expected to be permanent. As to the condition of "Panic Disorder/Agoraphobia," the Hearing Officer affirmed the earlier decision of the Deputy Executive Director. (A.P. at 65.51).

Following remand, the Deputy Executive Director again denied disability benefits to Mr. Gervais on the basis that the record failed to establish that the functional limitation associated with the condition "Depression Anxiety Syndrome/ Major Depressive Disorder with Anxious Distress," can be considered to be "permanent." (A.P. at 25.2). In reaching this conclusion, the Deputy Executive Director relied upon evidence in the record from Dr. Voss that Mr. Gervais' prescribed dose of Sertraline (Zoloft at 100 mg), should be increased "before it can be concluded his condition is permanent."

6

(A.P. at 25.1). Moreover, the Medical Board suggested that other types of medications should be explored and utilized, either alone or in combination. Finally, the Deputy Executive Director, again relying on the Medical Board's memorandum of May 18, 2017, as well as statements from the medical providers, found that the use of other "therapy options such as cognitive behavioral therapy, dialectic behavior therapy and psychotherapy," should be employed if the therapy Mr. Gervais was receiving was ineffective. The Deputy Executive Director concluded: ". . . [W]ithout demonstration that appropriate treatment has been pursued, permanency cannot be established." (A.P. at 25.2).

It is fair to conclude, based on the denial-of-benefits letter dated June 7, 2017, that the Deputy Executive Director was impressed by the fact that Mr. Gervais' condition and symptoms had not improved much, if at all, notwithstanding that he had been receiving the same treatment, from the same provider, with the same medication for almost two full years. This is particularly true in light of the evidence in the record from both Dr. Voss and Dr. Barter that Mr. Gervais's condition would be expected to have improved with appropriate treatment. (A.P. at 132 and 6.28).

Following the denial of benefits, the matter was again returned to the Hearing Officer "for the submission [of] additional evidence and a date for a hearing on the issue of permanency." (A.P. at 28.1). The Hearing Officer framed the issue as:

> Does the evidence establish that the functional limitation of significant difficulty interacting with others that arises from the condition of depression anxiety syndrome/major depressive disorder with anxious distress was expected to be permanent as of September 21, 2015, the Appellant's last day in service?

7

In the meantime, counsel for Mr. Gervais informed the Hearing Officer and opposing counsel that Dr. Howard Kessler, Ph.D. would be performing a neuropsychological examination of Mr. Gervais. The examination and related testing were conducted on July 7, 2017. (A.P. 29.1 and 29.8). Dr. Kessler thereafter identified several other psychological conditions from which Mr. Gervais could be suffering. These included:

Mild Neurocognitive Disorder Due to Multiple Etiologies, Small Vessel Ischemia vs. Alcohol Abuse;

Persistent Depressive Disorder (Dysthymia), With Persistent Major Depressive Episode;

Specific Phobia, Situational;

Unspecified Personality Disorder, With Obsessive-Compulsive Paranoid, and Dependent Features; and,

Alcohol Use Disorder, Mild vs. Alcohol Use Disorder, Moderate.

The hearing was originally scheduled for September 5, 2017. Because of the additional conditions identified by Dr. Kessler, however, the matter was again remanded to the Deputy Executive Director for consideration of the newly identified conditions, as well as the supporting materials submitted by Mr. Gervais from Dr. Garber and Dr. Barter. In August and September, 2017, Mr. Gervais was experiencing "new-onset atrial fibrillation," for which he was later admitted to the hospital for treatment. (A.P. at 36.237).

The Medical Board reviewed the new and additional materials submitted by Mr. Gervais, including the neuropsychological report prepared by Dr. Kessler. (A.P. at 33.4). Dr. Kessler's report raised the concern that Mr. Gervais had a potential alcohol abuse issue that could explain his lack of

8

improvement while in treatment. A concern with alcohol abuse had never before been raised by any of Mr. Gervais' medical providers (Drs. Barter and Garber) or by Dr. Voss. The revelation or disclosure that Mr. Gervais' use of alcohol was more significant than previously thought, was a "vexing concern" to the Medical Board. (A.P. at 33.5). Ultimately, the Medical Board did not believe that any of the additional conditions identified by Dr. Kessler were supported in the record. Moreover, the Board opined that "the basis for the original diagnosis of depression, anxiety syndrome/major depressive disorder with anxious distress be revisited. The possible confounding influence of alcohol use over time needs to be understood and reconciled before the Medical Board firmly agrees that the diagnosis of depression anxiety syndrome/major depressive disorder with anxious distress can be established." (A.P. at 33.7-33.8).

The Medical Board's Memorandum is dated December 7, 2017. In a letter dated December 14, 2017, the Deputy Executive Director again denied disability benefits to Mr. Gervais. First, the Deputy Executive Director concluded that there was insufficient evidence to support a finding that the additional conditions identified by Dr. Kessler existed as of September 21, 2015, the last date in service for Mr. Gervais. Additionally, the Deputy Executive Director determined that the evidence did not support a finding that the condition of depression anxiety syndrome/major depressive disorder with anxious distress was permanent.

The matter then returned to the Hearing Officer, who scheduled a hearing for March 1, 2018. The Hearing Officer framed six issues for his consideration, namely, whether the five additional conditions identified by Dr. Kessler existed as of September 21, 2015, and whether the functional limitation arising from the condition of depression anxiety syndrome/major

9

depressive disorder with anxious distress was expected to be permanent as of September 21, 2015. (A.P. at 35.1).

In preparation for the March 1, 2018 hearing, counsel for Mr. Gervais submitted an additional report from Dr. Kessler dated February 6, 2018 (A.P. at 36.6), an additional report from Dr. Voss dated February 5, 2018 (A.P. at 36.15), an additional report from Dr. Garber dated February 3, 2018 (A.P. at 36.240) and medical records of Mr. Gervais, including his hospitalization in September 2017. (A.P. at 36.31 et seq.). The testimonial hearing was held as scheduled on March 1, 2018. Karen and Lawrence Gervais both testified and were cross-examined. At the hearing, Mr. Gervais, through counsel, withdrew from consideration the issue of whether the condition of "alcohol use disorder, mild vs. alcohol use disorder, moderate" existed as of September 21, 2015. (A.P. at 37.2 and 38.25-38.26).

After the March 1, 2018 hearing, the parties agreed to subpoena the treatment notes of Dr. Garber, which were received in early April 2018. It is apparent to the court from the Final Recommended Decision that the Hearing Officer made a considerable effort to decipher Dr. Garber's handwritten notes. (A.P. at 411 et seq.). Once the treatment notes were received, however, the matter was again remanded to the Deputy Executive Director for reconsideration based on the entire record, including the additional testimony and exhibits produced for the March 1, 2018 hearing.

Prior to rendering his decision, the Deputy Executive Director received and reviewed a memorandum dated May 24. 2018 from the Medical Board, its' sixth such consultation in this case. (A.P. at 44.4). In essence, the Medical Board agreed that the evidence supported a diagnosis of "persistent depressive disorder (dysthymia) with persistent major depressive disorder with anxious distress." (A.P. at 44.5). This diagnosis subsumed the prior diagnosis of

10

"depressive anxiety syndrome/major depressive disorder with anxious distress." Regarding the other added conditions, the Medical Board found insufficient objective evidence to support them. With respect to the issue of the permanency of Mr. Gervais' functional limitation arising from his depressive disorder, the Medical Board remained unconvinced that "all reasonable treatments and standards of care have been attempted without obvious benefit or improvement in function." (A.P. at 44.7). In the view of the Medical Board, "[t]here is a reasonably high likelihood that with proper therapy persistent mood symptoms could be significantly ameliorated." (A. P. at 44.7). The Medical Board acknowledged that the medical providers for Mr. Gervais, as well as Dr. Voss aud Dr. Kessler, disagreed with its assessment of "permanence." The Board also recognized the "significant discrepancies" in the record relating to Mr. Gervais' use of alcohol and ultimately concluded that the issue of alcohol use "will more likely than not remain unresolved." (A.P. at 44.8).

In a letter dated May 31, 2018, the Deputy Executive Director again denied disability benefits to Mr. Gervais. He affirmed his earlier decision that the additional conditions identified by Dr. Kessler were not supported by the evidence. He accepted the suggestion from the Medical Board that the evidence did support a diagnosis of "persistent depressive disorder (dysthymia) with persistent major depressive episode with anxious distress." Finally, the Deputy Executive Director concurred with the views of the Medical Board that the functional limitation from that condition "cannot be considered to be permanent," particularly because Mr. Gervais had not demonstrated that "all reasonable treatment options have been tried without success." (A.P. at 44.2 – 44.3).

11

The matter was then in order for a decision by the Hearing Officer. (A. P[. at 45.1). At this stage, a question arose as to whether the decision by the Deputy Executive Director that the diagnosis of "persistent depressive disorder (dysthymia) with persistent major depressive episode with anxious distress," had introduced a new issue into the case. (A. P. at 46.1 & 49.2). Mr. Gervais, though counsel, indicated that Dr. Voss wished to respond to the Medical Board's most recent memorandum and opinions. (A. P. at 50.1). As a result, the briefing schedule before the Hearing Officer was stayed.

On July 31, 2018, Mr. Gervais, again through counsel, submitted a new report from Dr. Voss dated July 2, 2018. Mr. Gervais requested "that the matter be sent back to the Medical Board for another review in light of its new diagnosis and related response to it by Dr. Voss on behalf of Mr. Gervais." (A.P. at 53.1). In his letter of July 2, 2018, Dr. Voss did not appear to have any difficulty in concluding that "[t]he change to Persistent Depressive Disorder and Major Depressive Episode are in keeping with the nomenclature of DSM 5," although he noted that there is no specific category in DSM 5 for "anxious distress." (A.P. at 53.2). Dr. Voss, however, then proceeded to offer a detailed critique of the decision by the Deputy Executive Director of May 31, 2018 and the Medical Board's memorandum on which that decision relied. In the view of Dr. Voss, "the probability of improvement in mood symptoms that would allow him [Mr. Gervais] to resume teaching is very low to uil." (A.P. at 53.6).

Ultimately, in August 2018, MPERS filed an objection to the letter submitted by Dr. Voss. (A. P. at 55.2). The Hearing Officer, after receiving the positions of the parties, eventually sustained the System's objection to the admission of Dr. Voss' July 2, 2018 letter. (A. P. at 61.1). As a result, the

matter was set for decision by the Hearing Officer after the submission of final briefs.

The Hearing Officer issued his "Recommended Final Decision After Remand After Opportunity For Comments" on December 21, 2018. (A. P. at 67.3). Five issues were framed by the Hearing Officer.[1] They were:

1. Does the evidence establish that the functional limitation of significant difficulty interacting with others that arises from the condition of depression anxiety syndrome/major depressive disorder with anxious distress was expected to be permanent as of September 21, 2015?
2. Does the evidence establish the existence of mild cognitive disorder due to multiple etiologies, small vessel ischemia vs. alcohol abuse as of September 21, 2015, the Appellant's last day in service?
3. Does the evidence establish the existence of persistent depressive disorder (dysthymia) with persistent major depressive episode as of September 21, 2015, the Appellant's last day in service?
4. Does the evidence establish the existence of specific phobia, situational as of September 21, 2015, the Appellant's last day in service?
5. Does the evidence establish the existence of unspecified personality disorder with compulsive paranoid and dependent features as of September 21, 2015, the Appellant's last day in service? (A.P. at 67.7).

The Hearing Officer made extensive findings of fact based on his detailed scrutiny of the record evidence and testimony. Furthermore, the Hearing Officer analyzed each of the Medical Board's memoranda, and he explored the positions of the parties on all issues. The Hearing Officer correctly stated the applicable standard of proof, namely, that Mr. Gervais had

---

[1] As noted earlier, Mr. Gervais withdrew from consideration the issue of the existence of "alcohol use disorder, mild vs. alcohol use disorder, moderate."

13

the burden of demonstrating by a preponderance of the evidence that his mental or physical incapacity "is expected to be permanent" and "makes it impossible to perform the essential duties of [his or her] employment position." (A. P. at 67.24) *citing and quoting Jalbert v. Me. Pub. Emples. Ret. Sys., 2017 ME 69, ¶ 11, 158 A.3d 940.*

The Hearing Officer first addressed the diagnosis of "Depression Anxiety Syndrome/Major Depressive Disorder with Anxious Distress," as to which he had earlier determined that Mr. Gervais did have a functional limitation of significant difficulty interacting with people that made it "impossible" to perform the essential duties as a teacher as of September 21, 2015, his last date in service. As to that diagnosis, the remaining question was whether Mr. Gervais carried his burden of showing that the established functional limitation was expected to be permanent. (A.P. at 67.26).

The Hearing Officer noted that there was no "bright line" definition of what it means for an incapacity to be "permanent." Nevertheless, prior decisions by MPERS suggest that a member seeking disability retirement benefits must show that he has pursued an adequate trial of reasonable treatment options that are available and that those treatment options have failed. (A.P. at 67.26). Accordingly, the Hearing Officer focused on whether Mr. Gervais "has undergone an adequate trial of available treatment options." *Id.*

On this issue, the Hearing Officer clearly recognized the divergence of views as presented by the Medical Board and Mr. Gervais' medical providers and consultants. From the perspective of the Medical Board, the treatment of Mr. Gervais had not been aggressive enough. On the other hand, Dr. Voss believed that Mr. Gervais had undergone "adequate medication intervention" and "extensive psychotherapy." *Id.*

14

While the Hearing Officer acknowledged that Mr. Gervais had been "consistent" in participating in counseling for over 4 years (for 150 visits), and that Dr. Garber had utilized "cognitive behavior therapy" as one of the treatment approaches, the Hearing Officer was "perplexed" that Mr. Gervais had used the same medication for several years with minimal improvement in functionality, and there was no explanation in the record (other than the decision not to try Abilify) as to why a different medical trial had not been attempted. Stated otherwise, the Hearing Officer found it "difficult to accept that there were no other medications that could have been tried that might have built upon the results achieved by the Sertraline." (A.P. at 67.27 n. 9).

The Hearing Officer then considered what he referred to as the "elephant in the room," namely, whether Mr. Gervais had used alcohol to excess during his incapacity and whether that had negatively affected his treatment progress. (A. P. at 67.27). Again, the Hearing Officer found the discrepancies in the various accounts of Mr. Gervais' alcohol use to be "perplexing." (A.P. at 67.27, n. 11). It seems clear that the Hearing Officer was troubled by the fact that Dr. Kessler was detailed, specific and emphatic about the information he obtained from Mr. Gervais about his alcohol use, while Mr. Gervais himself testified that Dr., Kessler was either wrong or confused or both. Moreover, the Hearing Officer observed that Dr. Garber's handwritten notes reflected a concern with Mr. Gervais' alcohol use, notwithstanding the fact that Mr. Gervais denied such use. On the issue of alcohol use/abuse, the Hearing Officer concluded: "Ultimately, the vexing question of the alcohol use does not shift the needle one way of the other." (A.P. at 67.27).

In the final analysis, the Hearing Officer ruled:

15

> I conclude that the Appellant [Mr. Gervais] has not pursued an adequate trial of all reasonable treatment options available to him. Thus, he has not established that the functional limitation associated with the condition of Depression Anxiety Syndrome/Major Depressive Disorder with Anxious Distress is permanent by preponderance of the evidence.
> *Id.*

Regarding the condition of "Mild Cognitive Disorder due to Multiple Etiologies, Small Vessel Ischemia vs. Alcohol Abuse," the Hearing Officer found that Mr. Gervais had failed to meet his burden of showing that this condition existed as of September 21, 2015, his last date in service. (A.P. at 67.27).

Regarding the condition described as "Persistent Depressive Disorder (Dysthymia) with Persistent Major Depressive Episode," the Hearing Officer concluded, apparently with the agreement of the parties, that this condition was subsumed within the diagnosis of "Depression Anxiety Syndrome/Major Depressive Disorder with Anxious Distress." *Id.*

Regarding the condition described by Dr. Kessler as "Specific Phobia, Situational," the Hearing Officer found that this too was subsumed within the original condition snbmitted by Mr. Gervais as a basis for his claim for disability benefits. Moreover, the Hearing Officer found that there was insufficient evidence to show that "specific phobia, situational" existed as a "stand-alone condition." (A. P. at 67.28).

Finally, with respect to the condition of "Unspecified Personality Disorder with Compulsive Paranoid and Dependent Features," the Hearing Officer concluded that Mr. Gervais had failed to demonstrate that this condition existed at all and, if it did, that it was associated with his last date in service, to wit, September 21, 2015. (A.P. at 67.28).

16

As a result of these conclusions, the Hearing Officer recommended that the decision of the Deputy Executive Director denying Mr. Gervais disability retirement benefit be affirmed. The Recommended Final Decision of the Hearing Officer then went before the MPERS Board of Trustees in accordance with 5 M.R.S. § 17106-A, which provides:

> A decision of the hearing officer must be based upon the record as a whole. The board shall accept the recommended decision of the hearing officer unless the recommended decision is not supported by the record as a whole, the retirement system is advised by the Attorney General that the hearing officer has made an error of law or the decision exceeds the authority or jurisdiction conferred upon the hearing office. A decision of the board upon a recommended decision of the hearing officer constitutes final agency action.

The Attorney General did not advise the Board that the Hearing Officer had made an error of law. *(See Letter dated January 24, 2019, A. P. at 69.1)*. On February 14, 2019 the Board of Trustees adopted the decision of the Hearing Officer. Thereafter, Mr. Gervais filed this timely petition for judicial review. Following the submission of briefs, the court held oral argument on September 4, 2019.

## STANDARD OF REVIEW

This court's role in reviewing the appeal of Mr. Gervais pursuant to the Administrative Procedure Act and M.R.Civ.P. 80C has been stated clearly by the Law Court on numerous occasions. First, Mr. Gervais bears the burden of persuasion on appeal. *Anderson v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501. Moreover, his burden is a heavy one. Specifically, "[w]hen an agency concludes that the party with the burden of proof failed to meet that burden, we will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference." *Kelley*

17

*v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676 *quoting Douglas v. Board of Trustees*, 669 A.2d 177, 179 (Me. 1996). This standard of review has been followed consistently by the Law Court since it first appeared the *Douglas* decision. *See e. g., Jalbert v. Me. Pub. Emples. Ret. Sys.*, 2017 ME 69, ¶ 12, 158 A.3d 940; *Rossignol v. Me. Pub. Emples. Ret. Sys.*, 2016 ME 115, ¶ 6, 144 A.3d 1175; *Anderson, supra*, 2009 ME 134, ¶ 3; *Hale-Rice v. Maine State Retirement Sys.*, 1997 ME 64, ¶ 17, 691 A.2d 1232. The agency, in this case the Board of Trustees through the Hearing Officer, is authorized to decide the weight to be given to any evidence and the court is forbidden from substituting its judgment for that of the Board's. *See* 5 M.R.S. § 17106-A(3) ("hearing officers may accept, reject or determine the amount of weight to be given any information offered into evidence, . . ."); 5 M.R.S. § 11007(3) ("The court shall not substitute its judgment for that of the agency on questions of fact.").

## DISCUSSION

The Hearing Officer concluded that Mr. Gervais had "not established that the functional limitation associated with the condition of Depression Anxiety Syndrome/Major Depressive Disorder with Anxious Distress is permanent by preponderance of the evidence." (A.P. at 67.27). In order for the court to reverse this conclusion, it must find that the record evidence compelled the Hearing Officer to decide that Mr. Gervais had demonstrated the permanency of his incapacity by a preponderance of the evidence, to the exclusion of any other inference. The court has examined the extensive administrative record in this case and concludes that the Hearing Officer was not compelled by the evidence to find that Mr. Gervais had met his burden of proof.

18

With respect to this issue, the Hearing Officer found that Mr. Gervais had "not pursued an adequate trial of all reasonable options available to him." (A.P. at 67.27). The court cannot say that this conclusion was legally erroneous. The Hearing Officer certainly had before him substantial evidence to support the view that Gervais' condition might be permanent. That, however, is not the standard of review by which this court is governed. Moreover, the issue is not whether the court would have reached the same or a different conclusion had it been the factfinder. *See Seider v. Board of Examiners of Psychologists*, 2000 ME 206, ¶ 8, 762 A.2d 551.

Although all of Mr. Gervais' medical providers and consultants offered their opinions as to the permanence of his mental condition, the Hearing Officer was not obligated to accept those opinions at face. Rather, it was his responsibility to assess the believability and credibility of the evidence, including the testimony he heard in person.

There was evidence before the Hearing Officer that at least some of Mr. Gervais' medical providers and consultants seemed puzzled by the fact that he had not shown the improvement one would have expected, given his condition. Dr. Barter, for example, repeatedly informed school officials that he fully expected Mr. Gervais to recover and regain "good mental health." (A.P. at 3.59; 3.66; 3.78). Dr. Kessler also commented that Mr. Gervais' anxiety and depression "would ordinarily be considered eminently treatable," and, for that reason, thought the Medical Board's suggestion that his condition was not permanent was "well-taken." (A.P. at 29.24; *see also* 29.23). Dr. Barter believed, at least initially, that Mr. Gervais would be able to teach, albeit in a different school with a different principal. (A.P. at 6.34). The fact that Mr. Gervais' incapacity and inability to work coincided with interpersonal and professional difficulties and disagreements he was having

19

with a new principal, may raise an inference that his condition was more related to the dynamics of his particular school situation and environment, and that his condition should have been more receptive to some form of treatment.

The question of Mr. Gervais' alcohol use (or not) raised a number of possible inferences that the Hearing Officer was permitted to consider. For example, the Hearing Officer referred to that issue as the "elephant in the room." He found the alcohol use question to be "vexing." Although it was not determinative ("does not shift the needle one way or the other"), the alcohol use issue raised the inference that Mr. Gervais' confounding lack of improvement, while pursuing the same course of treatment for over four years, may be at least partially influenced by substance use, which in turn impacted the question of whether his condition was permanent.

In addition, the Medical Board ultimately disagreed with the views of Drs. Barter, Garber, Voss and Kessler on the question of permanency, and the Hearing Officer properly considered the Board's advisory opinions and was entitled to give them such weight as he deemed appropriate. 5 M.R.S. § 17106(4)(A) ("The retirement system shall consider the applicant's disability application, medical records and the medical board's analysis in making a disability retirement determination."). *See also Jalbert, supra*, 2017 ME 69, ¶ 15.

Finally, the Hearing Officer heard and saw the testimony of the witnesses, including Mr. Gervais, his wife and Dr. Voss. The Hearing Officer was clearly "perplexed" by the stark contrast between Dr. Kessler's account of his interview with Mr. Gervais regarding the latter's use of alcohol and Mr. Gervais' outright denial that he ever told Dr. Kessler that he had been consuming 4-6 light beers on a daily basis. (A.R. at 67.27, n. 11). The Hearing Officer seemed dubious that "[t]his conflict in accounts" was merely

20

a "colossal misunderstauding." (*Id.*). It was the Hearing Officer's responsibility and prerogative to assess and weigh the credibility of the witnesses, inclnding Mr. Gervais' testimony and explanation. The Hearing Officer was permitted to infer that the lingering qnestions abont Mr. Gervais' condition and its permanency were not resolved in any meaningful way through his own testimony. When that is taken into consideration, the Hearing Officer was not compelled to find by a preponderance of the evidence that Mr. Gervais' condition was permanent, to the exclusion of any other inference.

Similarly, the Hearing Officer was not compelled to find that Mr. Gervais had met his burden of proof that he was "disabled" as of his last date in service (September 21, 2015) as a result of the other conditions suggested by Dr. Kessler, namely, "Mild Cognitive Disorder due to Multiple Etiologies, Small Vessel Ischemia vs. Alcohol Abuse;" "Specific Phobia, Situational," or; "Unspecified Personality Disorder with Compulsive Paranoid and Dependent Features."

## CONCLUSION

The entry is:

Petitioner's Appeal pursuant to M.R.Civ.P. 80 **C** is DENIED and the Decision of the MPERS Board of Trustees is AFFIRMED.

The Clerk is directed to incorporate this Order by reference in the docket in accordance with M.R.Civ.P. 79(a).

DATE: January 8, 2020

William R. Stokes
Justice, Superior Court

21